**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CRIMINAL ACTION NO. 19-CR-190-DCR**

**UNITED STATES OF AMERICA**                                      **PLAINTIFF**

**V.**

**MAXWELL HAYSLIP**                                                  **DEFENDANT**

**SENTENCING MEMORANDUM**

Maxwell Hayslip, by counsel, submits the following memorandum to address 18 U.S.C. §3553(a) factors to be considered by this Court in determining the appropriate sentence to be imposed, particularly regarding the history and characteristics of this defendant, certain circumstances of the offense and the need to provide mental health and substance abuse treatment to defendant and restitution for the offenses.

Mr. Hayslip awaits sentencing before this Court, having pled guilty to 5 counts of 18 U.S.C. §2113(a), bank robbery by intimidation. In calculating his guideline sentence of 87 to 108 months, the Presentence Report (PSR) includes a 5 level increase in the offense level for possession of a firearm, pursuant to U.S.S.G. §2B3.1(b)(2)(C), based on Mr. Hayslip's possession of a handgun the day after the last robbery. If this Court does apply this 5 level increase, Defendant respectfully seeks an offsetting downward variance to reflect the circumstances associated with his possession of the handgun, along with an additional slight downward variance to reflect other factors addressed herein. The plea agreement negotiated by the parties instead reflected an alternative 2 level increase under U.S.S.G. §2B3.1(b)(2)(F) based on a threat of violence, which defendant

1

reserved the right to dispute at sentencing. Defendant's position is that neither enhancement should be applied, in which case the guideline range would be 51 to 63 months.

Those who know Max have consistently described him as very intelligent, exceptionally polite, compassionate and gentle natured. Despite the offenses for which this 27-year-old now stands before this Court, his personal history and certain aspects of his offense conduct offer some hope that the individual described by those terms does exist, if he can maintain control of his mental health issues and abstain from illegal drug use.

Mr. Hayslip comes from a family of intelligent and successful achievers in the fields of medicine, law, engineering and banking. He showed early signs of intellectual promise with an unusually inquisitive mind, enjoying hobbies like chess, reading and debate team participation. With little effort and despite substance abuse, he achieved an ACT score of 30 and maintained a B average while attending high school. At the same time, mental health records support his claim of feeling inadequate, depressed and impulsive during his teen years, particularly after his parents' divorce when he was 13 years old. Therapists diagnosed Max at that time with ADHD and depression. Both Max and his mother noticed that he often felt slow and "zombie-like" when taking his prescribed medications, with little improvement in his depression. After a few years, both Max and his mother agreed to discontinue those medications and try other forms of therapeutic behavioral approaches, but Max quickly found himself turning to illegal substances in an effort to self-medicate. He earned one of his two total criminal history points while still in high school, based on a conviction for breaking into cars as a way to support his addiction. While he did have a period of sobriety after that event, attending in-patient treatment and a semester of college, his life again began a slow downward spiral of depression, addiction, and various attempts at finding gainful employment and purpose in his life. In hindsight, Max, his parents and subsequent

therapists believe that he may have been incorrectly misdiagnosed with ADHD as a teen and the medications prescribed then were not the most effective at treating his issues.

It was during a difficult in late 2018 that Max came up with a foolish idea to finance his full-blown drug addiction. He decided to try robbing bank branches for relatively small dollar amounts. He had some general knowledge about banks since they were part of the family business established by his grandfather. Although he had never worked in any bank, he knew they were federally insured so he convinced himself no one would directly suffer financial loss from a robbery. He rationalized that no one could get hurt if the bank robber remained nonthreatening and carried no firearm or weapon. If anyone was going to be hurt during a robbery, he wanted to be sure it could only be him. He maintains that he practiced writing the demand notes he would later display to the tellers to be sure they reflected a calm, nonviolent tone.

Mr. Hayslip's conduct in committing the bank robberies was at the lowest end of the spectrum of force, violence or intimidation encompassed by 18 U.S.C. §2113(a), bank robbery by intimidation. He entered each of the banks dressed appropriately as a bank customer, with no effort to distort or hide his face or appearance. He waited in the teller's line like any other customer. He made his hands visible to the bank tellers during each robbery, placing them on the counter as he used both hands to display a note stating they were being robbed. There is no indication that he possessed a firearm or any dangerous weapon during any of the robberies. He never raised his voice or created fear for other tellers or customers in the bank. He thanked one teller and told another, "That's enough," when she continued to place more than $4,000 in the money bag. He "calmly" walked out of each bank.

In four of the five robberies the actual content of the demand notes was known due to surveillance video. Those notes contained no threat of death or physical harm. At the time of plea

negotiations and the PSR interview, the content of the note used in the fifth and last bank robbery in Lexington, Kentucky, was unconfirmed and based only on the teller's somewhat vague recollection of the words "die" or "armed." Max consistently maintained that the note used in that last bank robbery was still in his vehicle at the time of his arrest, was worded similarly to the four previous demand notes and, likewise, contained no threat of death or violence.  The PSR addendum did conclude it is likely that the note contained the word "dye" instead of "die."  Since then though, on January 31, 2019, the AUSA provided the undersigned defense counsel with new information that further supports this position. In a follow up interview with the teller in the Lexington, Kentucky, robbery, the investigating agent presented the teller with a note found in Hayslip's vehicle at the time of his arrest and she reportedly "remembered parts" of it and acknowledged that "it was similar to the note she saw and potentially could be it." That note stated, "This is a robbery, stay calm, no alarm. Give me all 50's/100's no alarm, gps or dye packs you have 15 seconds they'll fire you if you don't comply".  The teller stated that she did not get to see the whole note at the time of the robbery due to Mr. Hayslip holding it in his hands. During that same interview, the teller acknowledged that because she was not familiar with dye packs, she understood the word "dye" in the note to be "die." While the PSR addendum points out that this issue does not affect the guideline calculations, these facts are relevant as a circumstance of the offense in the 18 U.S.C. §3553(a) analysis.

      Following the robbery in Lexington, Kentucky on November 13, 2018, Mr. Hayslip drove back to his home in Alabama, as he did after each robbery. The next day, local police responded to a call regarding an unresponsive male in a parking lot. Max has a documented history of various suicide attempts, including by hanging. He further contemplated death by drug overdose or by

4

shooting himself. It was with that in mind that he possessed the firearm and methamphetamine in his vehicle at the time of his contact with responding officers in Alabama.

Mr. Hayslip's possession of this handgun should not be considered relevant conduct in attempting to avoid detection or responsibility for the robbery offenses. He had successfully driven home to Alabama the previous day, after the last bank robbery, without detection by law enforcement. The vehicle he was in was no longer serving as his getaway vehicle but simply his vehicle that he used for transportation on a regular basis. Mr. Hayslip had not packed up his personal belongings in his vehicle or performed any act suggesting he intended to flee from the area. He had taken no steps to hide or modify his appearance to avoid being identified. He had not gone into hiding and was committing no specific acts or omissions to avoid detection or responsibility for the robberies. Mr. Hayslip's conduct relevant to the robberies had ended and he had returned to his normal, albeit drug addicted, lifestyle. The absence of any specific further acts or omissions to avoid detection or responsibility for the offenses, suggests that his conduct at the time he possessed the handgun was no longer relevant to the robberies.

On the other hand, if this Court finds that Mr. Hayslip's firearm possession does qualify for the 5 level enhancement pursuant to U.S.S.G. §2B3.1(b)(2)(C), the circumstances of his possession fall at the lower end of the spectrum of conduct the robbery guideline penalizes for possessing or brandishing a firearm. Application of the 5 level enhancement to his conduct would, in effect, penalize him similarly to a defendant who had actually brandished or possessed a firearm during the robberies In order to avoid similarly penalizing such dissimilar conduct during a bank robbery, Mr. Hayslip asks that if this Court applies the 5 level increase pursuant to U.S.S.G. §2B3.1(b)(2)(C), a 2 to 3 level offsetting downward variance be granted in order to more appropriately reflect his actual conduct in possessing the firearm.

In July 2018, about a month prior to his first bank robbery, Max recognized that his impulsivity, drug use and depression were leading him to make foolish decisions, such as buying extremely excessive inventory for his online business. He obtained mental health support and records show that he reported to his therapist, "I'm manic. I'm impulsive. I'm going to mess up my situation." He also stated to the therapist that he "now knows" he needs to be back on medications. Although he did begin medication at that time to treat bipolar 2 disorder with depression, he did not resolve his illegal substance use, thereby negating many of the therapeutic benefits of his prescribed medications.

Mr. Hayslip credits his arrest as the intervention he needed to accomplish and maintain long term sobriety. During this period in custody, he has been fully compliant with medications to treat his bipolar 2 disorder and depression. He acknowledged to the undersigned defense counsel that while the needed medications do make him feel somewhat dulled and slow at times, that is the "trade off" for controlling the depression and manic impulsivity that hurt others and led him to the brink of self-destruction. He acknowledges that this is the first time he has fully embraced use of prescribed medications and the first time he has remined on them long enough to fully experience the mental health benefits. He also points out that the present medications seem significantly more effective, possibly due to a more accurate mental health diagnosis than in his teen years. Mr. Hayslip now understands that while illicit drugs previously provided short term emotional relief, they strongly contributed to his poor decisions and worsened his mental health issues.

Mr. Hayslip is presently focused on the challenge of maintaining lifetime sobriety, bettering himself, repairing family relationships, helping others and eventually finding productive work. He has consistently expressed strong remorse for his actions and seems acutely aware of their far-reaching impact on his family, the bank tellers involved and society as a whole. His family

describes it as like seeing the sun slowly make its way out from behind overwhelming layers of clouds. Mr. Hayslip has one of the strongest and most stable support systems the undersigned has encountered. To their credit, this family has not enabled or made excuses for Max's mistakes. Many of the letters of support for Max, submitted under separate filing, show real insight into his personal history and struggles.

  Mr. Hayslip also asks this Court to consider that his criminal history category II is based on 2 points. As mentioned previously, one point arose from a conviction for breaking into vehicles while he was still a high school student. The second point was derived from a guilty plea to the methamphetamine found in his vehicle at the time of his arrest in Alabama the day after the last robbery. The assignment of criminal history category II is correct but tends to overrepresent his experience with the criminal justice system. While Mr. Hayslip was admittedly engaging in illegal drug use throughout most of his adult life, he was also taking steps to further his education or establish gainful employment without receiving any criminal convictions between high school and the instant offenses. Prior to his present incarceration, he had never spent more than a few days in jail and this time spent in custody has had a strong impact on him.

  In summary, Mr. Hayslip asks this Court to consider his personal characteristics and mental health history and the circumstances of his offense and find that, if the 5 level enhancement for firearm possession is applicable, a substantial downward variance is appropriate to accomplish the desired sentencing objectives. In the absence of the enhancement, he asks this Court to sentence him at the low end of the then applicable 51 to 63-month range. Throughout the case he has stated an eagerness to make full restitution to the banks and submits that a reasonable fine would also be appropriate. He further asks that this Court recommend the intensive RDAP treatment program,

mental health assessment and vocational training. Mr. Hayslip seeks placement at a facility closest to his home in Birmingham, Alabama, to be near his family.

                    Respectfully submitted,

                    s/Mary Ann Leichty
                    205 Peach Orchard Circle
                    Fisherville, Kentucky 40023
                    leichtylaw@gmail.com
                    859/536-8405
                    Attorney for Defendant

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the foregoing **SENTENCING MEMORANDUM** has been served on February 18, 2020, by filing same via the CM/ECF system, which will send electronic notice to all counsel of record.

                    s/Mary Ann Leichty